**John Howard ABDNOR, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 235–93.**

Court of Criminal Appeals of Texas,
En Banc.

Jan. 26, 1994.

Rehearing Denied March 9, 1994.

Ronald L. Goranson, Dallas, for appellant.

John Vance, Dist. Atty., and Pamela Sullivan Berdanier, Asst. Dist. Atty., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

BAIRD, Judge.

Appellant was convicted by a jury of murder pursuant to Tex.Penal Code Ann. § 19.-02(a)(1). Punishment was assessed at life imprisonment. Penal Code § 12.32(a). The Court of Appeals affirmed appellant's conviction. *Abdnor v. State,* 756 S.W.2d 815 (Tex. App.—Dallas 1988) (*Abdnor I* ). On discre-

tionary review, we held the trial judge erred in overruling appellant's objection to the jury charge's failure to include a limiting instruction concerning an extraneous offense. We then remanded to the Court of Appeals for a harm analysis pursuant to *Almanza v. State.*[1] *Abdnor v. State,* 808 S.W.2d 476 (Tex.Cr. App.1991) (*Abdnor II*). On remand, the Court of Appeals held there was no harm in the trial judge's failure to include a limiting instruction in the jury charge. *Abdnor v. State,* 845 S.W.2d 302 (Tex.App.—Dallas 1992) (*Abdnor III*). We granted appellant's petition for discretionary review to determine whether the Court of Appeals erred in conducting its *Almanza* harm analysis.[2] We will reverse.

## I.

The trial record reveals appellant, who had a history of drug abuse and mental problems, killed the decedent, a nurse, with whom appellant became romantically involved during his stay in a psychiatric hospital. Appellant shot the decedent with a rifle. Appellant was apprehended in his apartment soon after the shooting by Dallas County deputy sheriffs.

Appellant was charged with murder pursuant to Penal Code § 19.02(a)(1). A competency hearing was held in which a jury found appellant competent to stand trial. Thereafter, appellant's trial commenced, lasting several weeks. Because appellant asserted insanity as a defense, both sides presented several psychological experts during the guilt/innocence portion of the trial. The jury ultimately rejected appellant's claim of insanity and found him guilty of murder.

During the guilt/innocence phase of trial, the State introduced testimony of Bryan Parsons, a friend of appellant whom appellant had met during a stay in a psychiatric hospital. We set out verbatim our factual summary from *Abdnor II:*

1. *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App. 1984).

2. Appellants two grounds for review state:
 Ground for Review No. 1:
 The court of appeals erred in overruling appellant's point of error that he suffered harm from the failure of the trial court to instruct

... On direct examination during the guilt/innocence phase, State's witness Bryan Parsons testified that appellant telephoned on July 25, 1980, two days before the alleged offense, and stated that complainant, appellant's girlfriend, had an abortion, and that appellant and complainant had terminated their relationship. During that conversation appellant stated, "That bitch really screwed up this time ... if she walked through that door right now I'd blow her head off. I'd just blow her right up against the wall." Parsons related that conversation to members of the Dallas County District Attorney's Office eight months later in March, 1981.

On cross-examination, defense counsel impeached Parsons with his statement of September 13, 1981, the Sunday before trial began, wherein Parsons stated that he had lied about the March, 1981 conversation. On redirect examination, the State attempted to rehabilitate Parsons. Parsons testified that he recanted his March 1981 statement because he feared appellant. His fear stemmed from two extraneous offenses. First, appellant previously pulled a knife on Parsons. Second, appellant telephoned Parsons' boss and threatened to kill Parsons. Both of these events allegedly occurred in June, 1980, approximately one month *prior* to the telephone conversation and the alleged offense.

Appellant objected to the admission of the extraneous offenses. Specifically, the record reflects the following:

> [Defense Counsel]: What we're objecting to, Your Honor, is the testimony, in effect, brings in extraneous matters and extraneous offenses: to-wit, assault, from the witness, which would be inadmissible for general purposes in this case, in that it would show—it would have a tendency to show that the Defen-

the jury about the limited purpose for which evidence of extraneous offenses was admitted.
Ground for Review No. 2:
 The court of appeals erred by failing to discern the difference among a preserved charge harm analysis, an unpreserved charge harm analysis, and a Rule 81(b)(2) "beyond a reasonable doubt" harm analysis.

dant is a criminal generally, and it is not really admissible on any issue in the trial.

... [I]t affects the state of mind of the witness, and its prejudice far outweighs any relevance of materiality of the testimony.

Basically, it is an extraneous offense: it's not relevant to the actual issues in this case. The State is only offering it for a limited purpose, and the prejudice outweighs its materiality.

THE COURT: Overruled.

\* \* \* \* \* \*

[Defense Counsel]: And I would also request that, as this testimony comes in, immediately after the witness makes the statements ... the Judge *instruct the jury, specifically, that the testimony is admitted only for the purposes of how it affects the credibility of the witness, and it's not to be considered for any purpose whatsoever as to whether or not the Defendant is guilty of the offense charged.*

THE COURT: Okay. Denied at this time. *I'll take that up when we take up the Charge.*

Prior to its submission to the jury, appellant objected to the court's charge for its failure to limit the jury's consideration of the extraneous offenses. Appellant offered several proposed charges for the trial court's consideration.

*Abdnor II*, 808 S.W.2d at 477–478 (emphasis in original) (footnote omitted). The trial judge, however, denied appellant's proposed charges and did not otherwise limit the jury's consideration of Parsons' testimony. Appellant's timely objection to the jury charge was overruled.

## II.

In conducting its harm analysis on remand, the Court of Appeals reviewed both Parsons' testimony concerning appellant's extraneous offenses and the State's comments on Parsons testimony during jury argument. *Abdnor III*, 845 S.W.2d at 304–308. While agreeing the trial judge erred in not limiting Parsons' testimony concerning the extrane-

ous offenses, the divided court found no harm resulted because:

[n]o emphasis was placed on the extraneous offenses with regard to the issue of sanity. Parsons' testimony about the extraneous offenses presented by the State, to explain Parsons' testimony about the inconsistent statements, covered less than three pages out of his 260 pages of testimony in the 5,600–page statement of facts. No other evidence was presented by the State regarding either the extraneous offenses or the credibility of Parsons.

*Abdnor III*, 845 S.W.2d at 309.

The court then held:

... We conclude that the context in which the State used Parsons' testimony relating to the extraneous offenses does not permit the testimony, by implication, to be drawn into the larger issue of sanity. The evidence of the offenses was used only to respond to the cross-examination and argument of defense counsel. Further, no expert testimony was elicited by either the prosecution or the defense that would lead to a jury concluding that only a sane person threatens others and then does not carry out the threat.

We conclude that the properly admitted, but erroneously unlimited, evidence of extraneous offenses caused no actual harm to appellant....

*Id.*

We granted appellant's petition for discretionary review to determine whether in conducting its harm analysis pursuant to *Almanza v. State*, 686 S.W.2d 157, the Court of Appeals had decided an important issue of state law in conflict with applicable decisions from this Court and because the justices of the Court of Appeals had disagreed upon a material question of law. Tex.R.App.P. Rules 200(c)(3) and (4).

## III.

The importance of proper instructions in the trial judge's charge to the jury is apparent in the context of the division of responsibilities between judge and jury in a jury trial. While states have traditionally been given broad leeway in dividing responsibility be-

tween judges and juries in criminal cases, *Spencer v. Texas*, 385 U.S. 554, 560, 87 S.Ct. 648, 652, 17 L.Ed.2d 606 (1967), Texas has followed the common law in assigning a fact-finding purpose to the jury. Tex. Const. art. I, § 15 interp. commentary (Vernon 1984). We have consistently held, and our Code of Criminal Procedure explicitly provides, that the "juror's are the exclusive judges of the facts ... [and] of the issues of facts." *Ex parte Thomas*, 638 S.W.2d 905, 907 (Tex.Cr. App.1982). *See also, Penagraph v. State*, 623 S.W.2d 341 (Tex.Cr.App.1981); *Weatherford v. State*, 31 Tex.Crim. 530, 21 S.W. 251 (App. 1893); *Short v. State*, 16 Cr.R. 44 (1879); *and* Tex.Code Crim.Proc.Ann. art. 26.13.

■ However, while the "jury is the exclusive judge of the facts, ... it is bound to receive the law from the court and be governed thereby." Tex.Code Crim.Proc.Ann. art. 36.13 (Vernon's 1981). In *Williams v. State*, 547 S.W.2d 18, 20 (Tex.Cr.App.1977), we explained "[t]he law must come from the court, the facts must be decided by the jury, *and the charge, to instruct the jury properly, must apply the law to the facts raised by the evidence.*"[3] *See also, Daniels v. State*, 633 S.W.2d 899 (Tex.Cr.App.1982); *Doyle v. State*, 631 S.W.2d 732, 738 (Tex.Cr.App.1982) (Op. on reh'g); *Rider v. State*, 567 S.W.2d 192, 195 (Tex.Cr.App.1978). The function of the jury charge is to instruct the jury on applying the law to the facts. In *Williams*, we emphasized

> It is not the function of the charge merely to avoid misleading or confusing the jury: *it is the function of the charge to lead and to prevent confusion. A charge that does not apply the law to the facts fails to lead the jury to the threshold of its duty: to decide those facts.*

*Id.*, 547 S.W.2d at 20. *See also, Williams v. State*, 622 S.W.2d 578, 579 (Tex.Cr.App.1981).

■ Moreover, because the charge is so essential to the jury's deliberations, "[i]t is clear that a charge must include an accurate statement of the law." *Cane v. State*, 698 S.W.2d 138 (Tex.Cr.App.1985). *See also, Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Cr.App.1978) ("It is well established that a correct instruction of the law relating to the offense charged must be given to the jury."). When the trial judge fails to correctly charge the jury on the applicable law, the integrity of the verdict is called into doubt because

> ... [allowing] the jury to receive an application of the law to the facts from the partisan advocates without a neutral and unbiased instruction on the matter in the charge ... [risks] the degeneration of trial by jury to a debating contest, where the persuasiveness of competing applications of the law to the facts determines guilt or innocence. There should be but one controlling application of the law to the facts, and that application should come from the court. *Its absence impairs the right to trial by jury and, therefore, by definition, is "calculated to injure the rights of the defendant,"* (art. 36.19, supra) *to a trial by jury.*

*Williams*, 547 S.W.2d at 20. Consequently, an erroneous or an incomplete jury charge jeopardizes a defendant's right to jury trial because it fails to properly guide the jury in its fact-finding function.

■ An erroneous or incomplete jury charge, however, does not result in automatic reversal of a conviction. Tex.Code Crim. Proc.Ann. art. 36.19[4] prescribes the manner of appellate review for jury charge error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Cr.App.1984). When reviewing charge errors, an appellate court must undertake a two-step review: first, the court must determine whether error actually exists in the charge, and second, the court must determine whether sufficient harm resulted from

---

3. All emphasis is supplied unless otherwise indicated.

4. Tex.Code Crim.Proc.Ann. art. 36.19 (Vernon's 1981) provides:

 Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 [V.A.C.C.P., relating to the trial judge's

charge to the jury] has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial. All objections to the charge and to the refusal of special charges shall be made at the time of the trial.

the error to require reversal. *Id.* *See also, Gibson v. State,* 726 S.W.2d 129, 132 (Tex.Cr. App.1987). The standard to determine whether sufficient harm resulted from the charging error to require reversal depends upon whether appellant objected. Where there has been a timely objection made at trial, an appellate court will search only for "some harm." By contrast, where the error is urged for the first time on appeal, a reviewing court will search for "egregious harm." *Almanza,* 686 S.W.2d at 171, *and Arline v. State,* 721 S.W.2d 348, 351 (Tex.Cr. App.1986).

■ In *Almanza,* we observed that if the error was subject to a timely objection at trial, "then reversal is required if the error is 'calculated to injure the rights of the defendant' which means that there must be no more than that there must be *some* harm to the accused from the error." *Id.,* 686 S.W.2d at 171 (emphasis in original). Essentially, this means that under the "some harm" analysis, "an error which has been properly preserved by objection *will call for reversal as long as the error is not harmless." Id.*

■ In *Arline,* 721 S.W.2d 348, we further explained the "some harm" analysis enunciated in *Almanza.* We initially remarked that the defendant must have suffered " 'some' *actual,* rather than theoretical harm from the error." *Arline,* 721 S.W.2d at 351. However, we further noted that "the presence of *any* harm, regardless of degree ... is sufficient to require a reversal of the conviction. Cases involving preserved charging error will be affirmed only if *no* harm has occurred." *Arline,* 721 S.W.2d at 351 (emphasis in original). *See also, Gibson,* 726 S.W.2d at 133. We have recognized, however, that the burden of proof lies with the defendant to "persuade the reviewing court that he suffered *some actual harm* as a consequence of the charging error. If he is unable to do so, the error will not result in a reversal of his

conviction." *LaPoint v. State,* 750 S.W.2d 180, 191 (Tex.Cr.App.1986) (Op. on reh'g). *See also, Belyeu v. State,* 791 S.W.2d 66, 75 (Tex.Cr.App.1989).

■ In contrast to art. 36.19, Tex. R.App.P. Rule 81(b)(2),[5] establishes the general standard of appellate review for trial error. *See, Belyeu,* 791 S.W.2d at 75, *Beathard v. State,* 767 S.W.2d 423, 432 (Tex.Cr. App.1989), *and Rose v. State,* 752 S.W.2d 529, 553 (Tex.Cr.App.1987). We have acknowledged that Rule 81(b)(2) is essentially the codification of the "harmless error" standard for constitutional errors enunciated by the United States Supreme Court in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Harris v. State,* 790 S.W.2d 568, 584 (Tex.Cr.App.1989), *and Mallory v. State,* 752 S.W.2d 566, 569–570 (Tex. Cr.App.1988). In *Chapman,* the Supreme Court stated: "The application of a state harmless-error rule is ... a state question where it involves only errors of state procedure or state law." *Id.,* 386 U.S. at 21, 87 S.Ct. at 826. Thus, in reviewing the applicability of Rule 81(b)(2), we have held Rule 81(b)(2)'s "harmless error" analysis typically applies to those trial errors amounting to a denial of federal or state *constitutional* rights and where there is no countervailing procedural rule or statutory provision. *Rose,* 752 S.W.2d at 554. *See also, Belyeu,* 791 S.W.2d at 75, *and Erwin v. State,* 729 S.W.2d 709 (Tex.Cr.App.1987). By contrast, art. 36.-19, and the *Almanza* standard of review, is limited to violations of art. 36.14 through art. 36.18 which do not implicate state or federal constitutional rights. *See, Rose,* 752 S.W.2d at 553.[6]

## IV.

### A.

With the foregoing in mind, we now address appellants' first ground for review in

---

**5.** Tex.R.App.P. Rule 81(b)(2) provides:

If the appellant record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

**6.** In situations where a charging error implicates a state or federal constitutional right, we have applied the "harmless error" analysis from Rule 81(b)(2) rather than an *Almanza* harm analysis. *See, Rose,* 752 S.W.2d at 553–554 (Rule 81(b)(2) applied to unconstitutional instruction on parole law given in charge to jury).

which appellant contends the Court of Appeals erroneously held the trial judge's failure to give the jury a limiting instruction on Parsons' testimony about appellant's extraneous offenses did not cause appellant "some harm" under *Almanza*.[7]

 We initially note that since we have already found error in the charge, *Abdnor II*, 808 S.W.2d 476, our review is limited to determining whether appellant has proven that the admission of the unlimited extraneous offenses caused him harm. *See, Gibson*, 726 S.W.2d at 133 *and, Arline*, 721 S.W.2d at 351. In doing so, we keep in mind that the error must be

> assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.

*Arline*, 721 S.W.2d at 351–352, *and Almanza*, 686 S.W.2d at 171.

The State introduced appellant's extraneous offenses on re-direct examination of Parsons to explain his inconsistent statements concerning a telephone conversation with appellant on July 25, 1980. Parsons testified he recanted his statements out of fear because appellant had twice threatened him (Parsons) in the month preceding the charged offense. We set the testimony in the record concerning appellant's extraneous offenses below:

> The State: I believe I asked you if you had a reason for, at that point in time, with the trial approaching the following Monday, to make those statements to me. Do you recall that?
>
> Parsons: Yes.
>
> The State: All right. You have testified earlier that when the Defendant was intoxicated, he got violent and got in people's faces; is that correct?
>
> Parsons: Yes, sir; that's right.
>
> The State: Let me ask you if you have had occasion to be in the presence of the Defendant—[the complainant] being killed on the 27th of July, which was a Sunday morning, and the telephone call being that Friday night before that, if within the week or two-week period prior to that, you had occasion to be in the presence of the Defendant?
>
> Appellant: Objection, Your Honor. The question calls for extraneous matters and is not limited solely to the purposes for which it's being offered.
>
> The Court: Well, as to that specific question, as to whether he was in the presence, I overrule the objection.
>
> Parsons: Yes, I was.
>
> The State: Do you recall what day of the week that was, or what night it was?
>
> Parsons: It was a Saturday night, I believe.
>
> The State: Was it the Saturday immediately preceding the killing of [the complainant], or was it the Saturday before that, or do you recall which Saturday it was?
>
> Parsons: It was not the preceding Saturday, but the week before.
>
> The State: The Saturday before that?
>
> Parsons: Yes.
>
> The State: Now, I'll ask you if the events that occurred on that night, plus conversations or plus information that was communicated with you—to you had a bearing upon what had occurred—had a bearing upon you telling me this—you made this up, because you didn't want to testify. Did it; what had happened with the Defendant and you?
>
> Parsons: Yes.
>
> The State: Tell the jury what it was that caused you, and why you called me, and why you told me that; in your own words.
>
> Parsons: Well, no; I'm sorry. Back up.
>
> The State: Okay. When you called me and you told me, "I made this up". because you didn't want to testify on Monday ...
>
> Parsons: Yes.
>
> The State: ... was there a reason?
>
> Parsons: Yes, there was a reason.

7. *See*, n. 2, *supra*.

The State: What was it? What was the reason?

Parsons: I was afraid.

The State: Okay. Tell me—tell the jury, in your own words, why you were afraid.

Parsons: I thought of this trial, and I heard about it and read about it, and I didn't know what the outcome was going to be. I've seen what money can do.

&ast; &ast; &ast; &ast; &ast; &ast;

The State: Did you feel like you were going to have anybody that would be with you and protect you after you testified.

Parsons: That's the reason I was scared.

The State: Okay.

Parsons: I have no guarantee of personal safety after this trial is over with ...

The State: Do you mean that—

Parsons: ... and I'm scared.

The State: Do you mean that?

Parsons: Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

The State: Was there any—in connection with being afraid, was there any activity involving the Defendant and you that caused you to be afraid and to make those statements to me?

Parsons: Yes. He had previously pulled a knife on me.

The State: Now, when was that? When did he do that?

Parsons: About a month or two before.

&ast; &ast; &ast; &ast; &ast; &ast;

The State: Can you tell us the circumstances surrounding that?

Parsons: Yes, I can.

The State: How it occurred?

Parsons: We went drinking together, and as he got more intoxicated, he became more violent, and we got in kind of an argument, and he pulled a knife, and I let him know he couldn't do that.

The State: How did you let him know he couldn't do that?

Parsons: I kicked him a good one.

The State: All right.

Parsons: And that was about the end of that.

The State: All right. Now, the following week, in connection with your being afraid to testify in this thing, did you have any conversations with Mike Durand?

Parsons: Yes, I did.

The State: What did Mr. Durand tell you?

Appellant: Objection to hearsay ...

The Court: Overruled.

Appellant: ... because, here again, Your Honor—at this time, I would request that the Court limit the testimony that is not related.

It's not being offered for the truth of the matter; just how it affects the credibility of this witness, and should not be considered at all against the accused, John Howard—

The Court: I will sustain it unless a predicate is laid that's proper.

The State: Did this statement have any bearing upon you being afraid to testify in this case and telling me you made this up; what Mr. Durand told you?

The Court: Yes, it did.

Appellant: I would still make the same request for limiting instructions, Your Honor ...

The Court: Overruled.

Appellant: ... because, again, the testimony is not being offered for the truth of the matter.

The Court: Overruled.

Appellant: Exception.

The State: What did he tell you?

Parsons: He told me that John had called and said he was going to take a .45 and bring it over and blow my head off.

The State: Now, how long was this after when you had taken the knife away from, when he was—you were out with him and he got drunk?

Parsons: A couple of weeks.

The State: A couple of weeks later?

Parsons: Yes.

The State: And how—what proximity was that to when he called you about [the decedent]?

Parsons: Two weeks later.

The State: Okay. So, we're talking about a month period, then?

Parsons: A month.

\* \* \* \* \* \*

On re-cross examination, appellant questioned Parsons concerning the extraneous offenses:

Appellant: All right. Now, you testified that Durand told you about some kind of threat—or, he communicated to you that John Howard said something to him about you and a gun; is that right?

Parsons: Yes, sir; that's right.

Appellant: Now, when did he communicate that to you?

Parsons: About two weeks before the murder.

Appellant: Can you be more specific than that?

Parsons: I don't know how to be more specific than that.

Appellant: Well, can you—

Parsons: It was two weeks before the murder took place.

Appellant: You mean, before [the decedent] was killed?

Parsons: Yes.

\* \* \* \* \* \*

Appellant: All right. Now, did you take that statement from Durand seriously, or did you just blow it off as, you know, somebody just running his head?

Parsons: I just blew it off, at the time.

Appellant: Just blew it off, at the time, because you didn't—did you report it to the authorities?

Parsons: No, sir.

Appellant: Did you call the police?

Parsons: No, sir.

Appellant: Didn't you take any action on it whatsoever?

Parsons: No, sir, I didn't.

\* \* \* \* \* \*

Appellant: Did you ever confront John Howard Abdnor with this?

Parsons: No, sir, I didn't.

Appellant: You never mentioned it to him?

Parsons: No, sir.

Appellant: So, no contact whatsoever?

Parsons: No, sir.

Appellant: Now, when John Howard Abdnor called you on July 25th, you claim, and talked to you the first time, from 11:30 up till 11:45 or 11:50, y'all talked about things other than [the decedent]?

Parsons: Yes, sir.

Appellant: Did you ever confront him with this threat that you claim Durand had related to you that John Howard had made?

Parsons: No, sir.

Appellant: Here's a man that you claim—you're talking to him on the phone, and he's calling you on the phone, and you claim that he has made some kind of statement like that, or you've been told he's made some kind of statement like that, by Durand, and you talked to him for fifteen or twenty minutes, and say, "Hey, John Howard. What's this I hear about you saying you're going to get a gun [and] shoot me?"; you never did do that?

Parsons: No, sir, I didn't.

\* \* \* \* \* \*

Appellant: Now, at that point in time, or at any time in that second conversation, did you ever say, "Hey John Howard, what about when you threatened ..." or, "Did you threaten me" or "Did you tell Durand you was going to shoot me"?

Parsons: No, sir, I didn't.

\* \* \* \* \* \*

Appellant: All right. Now—and you say that two weeks or two Saturdays before that Sunday—thirteen days before that Sunday—that was when you and John Howard had the incident where he pulled the knife on you?

Parsons: Yes, sir.

\* \* \* \* \* \*

Appellant: Now, this occasion when you claim that John Howard pulled a pocket knife on you, what kind of pocket knife was it?

Parsons: It was a small pocket knife.

\* \* \* \* \* \*

Appellant: All right. And you said you kicked John Howard "a good one"; is that right?

Parsons: Yes, sir.

Appellant: Did you mean that literally; you kicked—I mean, is that what you meant, literally?

Parsons: I kicked him to let him knew he couldn't get away with that.

Appellant: All right. At that point in time, had he already put the pocket knife back in his pocket; when you kicked him?

Parsons: Yes, sir.

Appellant: All right. So, what it was is two drunks was out, and y'all kind of got in an argument, and you got out of the car and he got out of the car, and he pulled a knife out of his pocket; right?

Parsons: No, sir. He got out of the car and came around to the passenger side and opened the door, and had the pocket knife in his hand.

Appellant: And then he put the pocket knife back up; right?

Parsons: That's right.

Appellant: All right. And you got out of the car, and you kicked him a "good one"?

Parsons: I kicked John, yes.

\* \* \* \* \* \*

Appellant: All right. Now, did he try to get the pocket knife back out to hurt you?

Parsons: No, he didn't.

\* \* \* \* \* \*

The State made references to the extraneous offenses during its closing jury argument when the State stressed the credibility of its witnesses.

The State: If Bryan Parsons is telling the truth, if Marsha Herring is telling the truth, it shows a predisposition, a pre- planning, a pre-thought process, on behalf of the Defendant.

[Appellant's Counsel] told you, he said, "I don't know how in the world anybody—[the prosecutors]; whoever it may be—could stand up in front of twelve people and vouch for the credibility of Bryan Parsons".

I can and I will, and I'll do my best to explain why.

\* \* \* \* \* \*

What did Bryan Parsons tell you? He said, "It was about that time that I contacted the D.A.'s office, and when it got close to trial, I said, 'Hey, I made it all up' ".

And why?

"Because of what I had seen in the newspapers", ladies and gentlemen, "and because of what the Defendant told Mike Durand he was going to do to me", and one other thing that is very important:

"I've seen what money can do, and after this case is over and, [the prosecutor], you're long gone and the jury's gone home, and if this man is convicted of what he should be convicted of, murder ...

Appellant: Objection, Your Honor. He's outside the ...

The State: ... from the—

Appellant: ... record—excuse me, [to the prosecutor].

The State: He's outside the record; it's not a proper reference, and that testimony was also admitted for the limited purposes of the credibility of Bryan Parsons, and not for general purposes only.

The Court: I sustain the objection at this time.

Re-state ...

Appellant: May we have—

The Court: ... or rephrase—

Appellant: May we have the jury instructed to disregard that argument?

The Court: Disregard that, the way it was phrased.

Appellant: Motion for mistrial, Your Honor.

The Court: Overruled.

Appellant: Exception.

The State: In connection with what he said to you: "... there won't be anybody there to protect me."

Now, how do we know he's telling the truth? Why should we believe him? Why should you believe him?

He said that he—the Defendant, he has been out with him; he's been drinking with him. He says that when he drinks and gets intoxicated, he gets violent, and gets in peoples faces.

Does Sandy Chasteen's testimony corroborate that?

Remember Donna saying, as far as the conversation with the father about the money; about that she had already spent her rent money on medical expenses, because of the Defendant's actions

Remember the—

Appellant: Objection, Your Honor. That's not a proper—that's not what she said. It's outside of the record, and it's totally false; fabricated.

The State: Well—

The Court: If he just—

Appellant: Your Honor ...

The State: —that—

Appellant: ... it's outside the record.

The Court: Excuse me.

Appellant: It's outside the record, Your Honor.

The Court: Stay in the record.

Appellant: May I have the jury instructed to disregard—first off, is the objection sustained or overruled?

The Court: No, it's overruled.

I will instruct the jury to go by the record, the way they heard it.

Appellant: Note our exception.

The Court: It's noted.

The State: —that "the Defendant had pulled a knife on me".

\* \* \* \* \* \*

The State: There's your corroboration for Bryan Parsons, and I'll stand by him, from the evidence.

If he wanted to sensationalize, he would have said the phone call took place the night of the murder. And what, possibly does he have to gain from doing that?

He told you that, at the time of the call, Mr. Warden and Mr Cotton were there, out there at Strawberry Fields, and [Appellant's Counsel] went into that, to a great extent.

It's very simple: bring them down here.

Did he?

The Defendant said, "I'll blow your head off ..."—that's why he didn't want to testify—"... with a .45".

Now, if Parsons is lying—

Appellant: Excuse me. I'm going to object, Your Honor; that's not a correct statement of what the evidence was.

The Court: Well—

Appellant: There is no testimony that the Defendant said that; there's testimony that Bryan Parsons said somebody else said that John Howard Abdnor said that.

The Court: Well—

Appellant: That's an incorrect reference to—

The Court: I overrule the objection, and instruct the jury to go by the evidence they heard.

The State: From Mike Durand—

Appellant: Exception.

The State: From Mike Durand, who owned Strawberry Fields where the Defendant used to work and was terminated; that information was related by Mr. Durand to Mr. Parsons about what the Defendant would do; about kicking him after the Defendant pulled a knife on him, and we got into that.

After reviewing the entire record, we conclude the failure to limit the extraneous offenses harmed appellant in two ways: first, the jury was prejudiced by the similarity of the extraneous offenses to the charged offense, and second, the extraneous offenses

undermined appellant's insanity defense because the jury could have concluded appellant was capable of conforming his conduct.

### B.

It is now axiomatic that a defendant is to be tried only on the crimes alleged in the indictment and not for being a criminal generally. *Abdnor II*, 808 S.W.2d at 478 (citing *Wilkerson v. State*, 736 S.W.2d 656, 659 (Tex.Cr.App.1987), *and Crank v. State*, 761 S.W.2d 328, 341 (Tex.Cr.App.1988)). Thus, evidence of extraneous offenses or bad acts committed by the defendant may not be introduced during the guilt/innocence portion of the trial to show the defendant acted in conformity with his criminal nature. *Lockhart v. State*, 847 S.W.2d 568, 570 (Tex.Cr.App.1992); *Montgomery v. State*, 810 S.W.2d 372, 386 (Tex.Cr.App.1990), *and Abdnor II*, 808 S.W.2d at 478; Tex.R.Crim.Evid. 404(b). This is because evidence of extraneous offenses "is inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be brought against him." *Crank*, 761 S.W.2d at 341. We have also recognized that a greater prejudice to the defendant results from the revelation of past criminal conduct than noncriminal "bad acts." *Plante v. State*, 692 S.W.2d 487, 490 n. 3 (Tex.Cr.App.1985).

Nonetheless, evidence of extraneous offenses is admissible for a limited purpose where such evidence is material and relevant to a contested issue in the case. *Abdnor II*, 808 S.W.2d at 478; *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex.Cr.App.1972). *See also, Lockhart*, 847 S.W.2d at 571 (evidence of extraneous offenses is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."). Among the purposes for which extraneous offenses are admissible is to explain a witnesses' prior inconsistent statement. *Abdnor II*, 808 S.W.2d at 478 (citing *Williams v. State*, 604 S.W.2d 146, 150 (Tex.Cr.App.1980)). When extraneous offenses are admitted for a limited purpose, the defendant is entitled, on timely request, to an instruction by the trial judge to the jury limiting the jury's consideration of the extraneous offenses to those purposes for which they are admitted. *Porter v. State*, 709 S.W.2d 213, 215 (Tex.Cr.App.1986); *Crawford v. State*, 696 S.W.2d 903, 907 (Tex. Cr.App.1985); *Hitchcock v. State*, 612 S.W.2d 930, 930–931 (Tex.Cr.App.1981). Failure to give a limiting instruction, upon timely request, is "reversible error." *Porter*, 709 S.W.2d at 216.

We have consistently acknowledged that the introduction of extraneous offenses to the jury is inherently "prejudicial," *Sattiewhite v. State*, 786 S.W.2d 271, 285 (Tex.Cr.App.1989), and hence, harms the defendant, because it requires the defendant to defend against not only the offense charged but also his uncharged actions. *See, Crank*, 761 S.W.2d at 341; *Robinson v. State*, 701 S.W.2d 895, 899 (Tex.Cr.App.1985). *See also, Plante*, 692 S.W.2d at 490 n. 3. The admission of extraneous offenses also prejudices the defendant because of the jury's natural inclination to infer guilt to the charged offense from the extraneous offenses. *See, Lockhart*, 847 S.W.2d at 570, *and Templin v. State*, 711 S.W.2d 30, 32 (Tex.Cr.App.1986). A manner of lessening the prejudice from the extraneous offense is to give a limiting instruction to the jury. *Robinson*, 701 S.W.2d at 899. But where no limiting instruction is given, however, we must conclude that any prejudice resulting from introduction of the extraneous offense is unabated. *See, id.*

In *Wood v. State*, 118 Tex.Crim 99, 39 S.W.2d 1094, 1095 (App.1931), we noted that a limiting instruction is not necessary where the extraneous offenses are so dissimilar to the charged offense that the jury cannot mistakenly draw a connection between the charged offense, and the extraneous offenses. *Id.*, 39 S.W.2d at 1095. *See also*, 23 Tex. Jur.3d *Criminal Law* § 2818 (1982) (and cases cited under n. 22). The underlying assumption, of course, was that the unlimited introduction of extraneous offenses similar to the charged offense harms a defendant because the jury will inevitably presume guilt from the extraneous offenses to the charged offense. *See, Wood*, 39 S.W.2d at 1095. We have subsequently found in a number of cases that the admission of extraneous of-

fenses similar to the charged offense, and admitted without limiting instructions, harmed the defendant because the jury was allowed to convict on the assumption that the defendant was acting in conformity with a criminal character. *See, Lockhart,* 847 S.W.2d at 570.

In *Hitchcock v. State,* 612 S.W.2d 930 (Tex. Cr.App.1981), the defendant was convicted of indecency with a child. At trial, the State introduced evidence that Hitchcock had committed other offenses, consisting of rape, incest, and sodomy. The trial judge denied Hitchcock's request for an instruction in the charge which limited the jury's consideration of the extraneous offenses. We held that a limiting instruction was warranted and reversed the conviction. *Id.,* at 931.

Similarly, in *Johnson v. State,* 509 S.W.2d 639 (Tex.Cr.App.1974), the defendant was convicted of robbery. For the purposes of proving Johnson's identity in the charged offense, the State introduced evidence at trial of a separate robbery committed by Johnson against the same complainant. The trial judge denied Johnson's written request for an instruction in the charge which limited the jury's consideration of the extraneous robbery. We held the trial judge's failure to give a limiting instruction in the jury charge was reversible error because the charge, as given, allowed the jury to consider the extraneous robbery as evidence of Johnson's guilt in the charged offense, rather than simply proving his identity. *Id.,* at 640.

Further, in *Springfield v. State,* 356 S.W.2d 940, 940–941 (Tex.Cr.App.1962), the defendant was convicted of illegally selling securities. In order to prove that Springfield was a dealer in securities, the State intro-duced evidence that Springfield made illegal sales of securities in addition to the charged offense. We held the trial judge committed reversible error by failing to give an instruction in the charge which limited the jury's consideration of the other sales to the purpose for which they were admitted, that is, to prove Springfield was a "dealer" in securities. *Id.,* at 941.

Finally, in *Jones v. State,* 296 S.W.2d 271 (Tex.Cr.App.1956), the defendant was convicted of illegally selling whiskey in a dry county. The arresting officer testified at trial that appellant had used a twelve-year-old boy to act as go-between during the sale for which Jones was arrested. *Id.,* at 272. On cross-examination, appellant denied ever using a young boy to sell whiskey for her. *Id.* To impeach Jones, the State introduced testimony by a different boy who testified that he had sold whiskey for Jones subsequent to the charged offense. *Id.* We held the trial judge's failure to give a limiting instruction in the jury charge was reversible error because the evidence that Jones had used children to sell whiskey prejudiced the jury. Consequently, the evidence of the subsequent sales could have been used by the jury for purposes other than merely impeaching Jones' testimony. *Id.,* at 272.

In conducting its harm analysis, the Court of Appeals failed to discuss the cases we have cited nor cite any other caselaw which addressed the harm resulting from the unlimited introduction of extraneous offenses.[8] *See, Abdnor III,* 845 S.W.2d at 309. Thus, we review the Court of Appeals' harm analysis, keeping in mind that the court neglected our decisions which hold the harm resulting from the introduction of extraneous

---

8. We note that while the cases we have uncovered were all decided prior to our enunciation of the "harm analysis" in *Almanza,* their holdings that the unlimited admission of extraneous offenses are reversible error are unaffected by *Almanza.* In *Almanza,* we merely required a defendant to show harm from a charging error before we would reverse. This requirement that harm be shown had no effect upon our recognition that certain charging errors are inherently harmful. We have consistently recognized both before and after *Almanza* that extraneous offenses are inherently prejudicial, and hence harmful to a defendant. *See, Sattiewhite,* 786

S.W.2d at 285. However, even this harm may be abated with a proper limiting instruction. *See, id. See also, Robinson,* 701 S.W.2d at 899. Our focus, therefore, is on the error in the context of the entire trial, not isolated in a vacuum. Where, as in the instant case, an error has been committed at trial, and the error is harmful, *Almanza's* "harm analysis" necessarily requires us to determine whether the harm from the error was somehow abated. *See, Arline,* 721 S.W.2d at 351–352, and *Almanza,* 686 S.W.2d at 171. If it is not abated, then a defendant has certainly proven some harm.

offenses must be ameliorated, otherwise, there is "some harm."

In the instant case, the extraneous offenses were admitted for the limited purpose of explaining Parsons' inconsistent statements. *Abdnor II,* 808 S.W.2d at 478. However, the jury could have easily concluded from the evidence of the extraneous offenses that appellant possessed a violent character and was acting in conformity with that character when he committed the charged offense. This inference by the jury is supported by the similarity between the charged offense and the extraneous offenses since all the offenses involved violence or the threat of violence. *Compare, Hitchcock,* 612 S.W.2d at 931.

Further, the similarity of appellant's alleged telephone threat against Parsons likely prompted the jury to attribute guilt to the charged offense from the extraneous one. The threat appellant allegedly made against Parsons shared several characteristics with the charged offense which would naturally prompt the jury to conclude appellant acted in conformity with his criminal character with both offenses. *See, Ransom v. State,* 503 S.W.2d 810, 812–814 (Tex.Cr.App.1974), *and* 2 Ray, *Texas Evidence,* § 1521 (3rd ed. 1991). Parsons testified that during his telephone conversation with appellant, appellant stated:

> "That bitch has really screwed up this time. If she walked through that door right now, *I'd blow her head up against the wall.*"

Later, Parsons testified about the threat appellant made against him and communicated to Parsons' employer, Mike Durand:

> [Durand] told me that John had called and said *he was going to take a .45 and bring it over and blow my head off.*

■ The similar characteristics between appellant's threat against the decedent and his threat against Parsons are obvious: Appellant allegedly telephoned Parsons' employer and threatened to kill Parsons just two weeks before he telephoned Parsons and threatened to kill the decedent. The jury's deliberations on the charged offense were undoubtedly influenced by the apparent connection between the charged offense, and appellant's alleged threat over the telephone to kill Parsons. Thus, the unlimited introduction of appellant's second extraneous offense allowed the jury to infer guilt to the charged offense.

■ Further, the trial judge took no steps to limit this inference by the jury either at the time the extraneous offenses were introduced or when the trial judge charged the jury. In *Rose,* we stated there is an presumption that the jury will properly consider evidence when correctly instructed by the trial judge. *Id.,* 752 S.W.2d at 554 (citing *Cobarrubio v. State,* 675 S.W.2d 749, 752 (Tex.Cr.App.1983)). Conversely, where no instruction is given, we cannot follow the presumption that the jury properly considered the evidence at trial. Thus, in the instant case, we cannot conclude the jury properly considered the extraneous offenses. Moreover, the State's references to the extraneous offenses during closing argument did not abate the prejudice resulting from their unlimited admission. Such references were partisan comments, rather than an unbiased instructions, and merely drew attention to appellant's alleged other offenses in addition to the one for which he was charged. *See, Williams,* 547 S.W.2d at 20.

### C.

■ We also find the introduction of the extraneous offenses harmed appellant by undermining his insanity defense because the unrealized threats of violence against Parsons suggested appellant was able to conform his conduct to the requirements of the law. *Abdnor II,* 808 S.W.2d at 479 (Baird, J., concurring and dissenting op.). *See also,* Tex.Penal Code Ann. § 8.01(a) (Vernon's 1974).[9] The issue of appellant's sanity was strongly contested at trial. Appellant pre-

---

**9.** Tex.Penal Code Ann. § 8.01(a) was subsequently amended by the Legislature in 1983 to exclude a defendant's inability to conform his conduct to the law. *See* Acts 1983, 68th Leg., p. 2640, ch. 454, § 1. Because appellant committed the of-fense while pre-amended version of § 8.01(a) was still in effect, the issue of whether appellant was able to conform his conduct to the requirements of the law is valid regardless of whether he knew that his conduct was wrong.

sented three experts, Dr. Gene W. Rogers, the Abdnor family physician, Dr. George Mount, a psychologist, and Dr. Sanford Lehrer, a psychiatrist, to support his claim of insanity. All three testified at length that appellant had a mental history of paranoid schizophrenia and was suffering from paranoid schizophrenia at the time of the offense. Significantly, each expert opined that because of appellant's schizophrenia, appellant was unable to conform his conduct to the legal requirements at the time of the offense. To counter appellant's experts, the State presented Dr. Clay Griffith, a psychiatrist, who testified he examined appellant four months after the offense. From his examination of appellant Dr. Griffith concluded appellant was not insane at the time of the offense. Dr. Griffith further opined appellant was capable of conforming his conduct to the requirements of the law when he committed the offense.

We believe that any evidence which had bearing on appellant's capability of conforming his conduct at the time of the offense necessarily impacted upon appellant's insanity defense. The extraneous offenses introduced by the State are just such evidence. In particular, evidence of appellant's alleged telephone threat against Parsons was damaging because it contradicted appellant's evidence that was incapable of conforming his conduct. Appellant's carried out his threat to "blow [the decedent's] head up against the wall", but did not carry out his prior threat to "take a .45 and blow [Parsons] head off." A jury which had been instructed to consider the extraneous offense only as it pertained to Parsons' inconsistency might have disregarded such evidence as it pertained to the larger issue of appellant's sanity, but a jury lacking a limiting instruction in the charge certainly would not have. See, Rose, 752 S.W.2d at 554. The jury could have easily contrasted these two incidents and concluded that appellant was not insane at the time of the offense because he had refrained from carrying out the similar threat just two weeks earlier.

10. Having found that the Court of Appeals erred in applying its Almanza/Arline harm analysis, we

## V.

 We hold that the Court of Appeals erroneously concluded that appellant suffered "no harm" from the trial judge's failure to give a limiting instruction on appellant's extraneous offenses. Without an instruction in the charge which limited the jury's consideration of appellant's extraneous offenses, the jury was without the necessary guidance to accurately decide the facts of appellant's case. See, Williams, 547 S.W.2d at 20. As a result, the jury was unable to perform its function as fact-finder. Id. We find, therefore, that appellant suffered "some actual harm." Almanza, 686 S.W.2d at 171, and Arline, 721 S.W.2d at 351. The judgment of the Court of Appeals is reversed and the case is remanded to the trial court.[10]

CLINTON, J., concurs in the result.

McCORMICK, P.J., and WHITE and MEYERS, JJ., dissent.

need not address appellant's second ground for review.