**Tamara Ann HEINS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–03–00940–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 24, 2004.

458

James L. Steele, Houston, for appellant.

Dan McCrory, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices HUDSON and SEYMORE.

## OPINION

HEDGES, Chief Justice.

Appellant Tamara Heins brings this appeal from her conviction for the murder of her husband, John Heins, for which the jury sentenced her to eight years in prison. Appellant presents three issues for our review: whether the trial court erred in its statement of the law in the jury charge regarding the lawful carrying of handguns; whether the trial court erred in

overruling appellant's objection to the testimony of an assistant prosecutor; and whether appellant received ineffective assistance of counsel. We reverse and remand for a new trial.

## Background

Appellant and the decedent, John Heins, met in 1993 and married in 1995. The marriage was not a stable one; testimony offered at trial showed that the decedent, HIV-positive and an habitual steroid user, abused appellant, her son, and the family pets, one of which he beat to death. Appellant suffered chronic back pain from being hit by a drunk driver when she was twenty years old. The abuse she received from the decedent further exacerbated the injuries, necessitating multiple surgeries on her back and neck.

The couple separated a number of times, but would reconcile after the decedent promised to seek treatment. Appellant bought a home in 1999 during one of the couple's separations; they later reconciled, and the decedent moved in with appellant and her son. Appellant filed for divorce in January of 2001, but the couple continued to live together. In late 2001, after another incident of abuse by the decedent, appellant left the state with her son for a one-month vacation. The couple had originally intended the month to be time spent apart in hopes of improving the marriage; however, after being attacked by the decedent, appellant made the decision the marriage would come to an end once and for all upon her return. She and the decedent agreed that he would live in the home until her scheduled return at the end of November since he had paid the November mortgage payment on the house.[1]

Appellant and her son returned from out of state early; however, pursuant to her arrangement with the decedent, she allowed him to stay in the house while she stayed with her mother and drove her son to school 35 miles away. On December 1, 2001, appellant called the decedent to ask him to leave the house in accordance with their agreement; he refused, telling her that she could return home but that he would not leave. Appellant had her father call as well, but to no avail. Appellant, in pain (due to her chronic back and neck problems) and exhausted from driving over 140 miles to and from her son's school each day, decided that the only way to resolve the conflict would be in person. She drove to her house, hoping that once the decedent saw how upset and in pain she was, he would back down and leave as he had in the past.

When appellant arrived at the house, she saw the decedent's car and truck in the driveway and became apprehensive. Fearing the decedent's possible aggressive behavior and remembering that he had pulled a gun on her several times in the past, she placed her .38 caliber gun in her purse and entered the house.

Appellant found the downstairs empty; however, the decedent soon came downstairs and a confrontation ensued. The decedent told appellant that he wouldn't leave. When she told him she needed to return home to sleep in her bed in preparation for back injections, he allegedly told her, "it doesn't matter where you want to sleep because I'm going to break you in half." He then threw his glasses on the floor in a clear act of aggression and crouched as if he were about to tackle her. Appellant backed up and drew her gun. When she did, the decedent said, "go ahead, do it," and lunged forward. Appellant fired a single shot, striking the decedent in his upper chest. The decedent died a short time later.

---

1. Appellant had made the down payment and     all other mortgage payments on the house.

### Analysis

In appellant's first point of error, she claims that she was harmed when the trial court incorrectly instructed the jury on the exemptions to unlawfully carrying a handgun. Although appellant's attorney did not object to this incorrect charge, appellant claims the trial court committed egregious error under the *Almanza* standard. We agree.

Defendants are entitled to be convicted on correct statements of the law. *Murphy v. State*, 44 S.W.3d 656, 665 (Tex. App.—Austin 2001, no pet.). The integrity of the verdict is called into doubt if a trial court fails to correctly charge the jury on the applicable law. *Id.* (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex.Crim.App. 1994)).

The manner in which appellate courts analyze jury charge error is prescribed in article 36.19 of the Code of Criminal Procedure. *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Crim.App.1986) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985)). We must first determine whether error exists in the charge. *Almanza*, 686 S.W.2d at 171. We must then determine whether the error, if any, caused harm sufficient to require reversal. *Id.* If charging error was not preserved at the trial court level, a greater degree of harm, egregious error, is required. *Id.* Errors that meet this standard are of the type which go to the very basis of the case, deprive the defendant of a valuable right, or vitally affect the defense. *Id.* at 172. The following factors should be considered when measuring the actual degree of harm: the entire charge; the state of the evidence, including contested issues and the weight of probative evidence; the arguments of counsel; and any other relevant information the record, as a whole, reveals. *Id.*

In the guilt/innocence phase, the jury was instructed on the laws regarding murder and self-defense. The court also instructed the jury that the use of force in self-defense would not be justified "if the defendant sought an explanation from or discussion with the victim concerning the defendant's difference with the victim while the defendant was unlawfully carrying a weapon." As to the law regarding unlawfully carrying a weapon, the jury was instructed as follows:

Our law provides that it is unlawful for a person to intentionally or knowingly carry a handgun on or about her person.

It is not an offense for a person to carry a handgun; . . .

**3. is on the person's own premises under the person's control.**

(emphasis added). This is an incorrect statement of the law. Under the Texas Penal Code section 46.15(b)(2), the third exemption to unlawfully carrying a handgun as stated in the charge should have read "is on the person's own premises *or premises* under the person's control" (emphasis added). By omitting the italicized words, the court committed error. Appellant was entitled to be convicted on a correct statement of the law; since the trial court failed to correctly charge the jury on the applicable law, the integrity of the verdict is thus called into doubt. *Murphy*, 44 S.W.3d at 665.

Appellant's counsel did not object to the erroneous jury charge. Using the factors listed in *Almanza*, we must therefore determine whether the error committed by the trial court is an egregious one, that is, whether appellant had a fair and impartial trial. Considering the charge itself, the evidence, the arguments of counsel, and other relevant information, we believe egregious error was committed.

Appellant claimed that she shot the decedent in self-defense when he told her he would "break her in half," threw off his glasses, and lunged at her. Under Texas law, the use of force is justified when the actor reasonably believes that force is immediately necessary to protect herself against an aggressor's use (or attempted use) of unlawful force. TEX. PEN. CODE ANN. § 9.31 (Vernon 2003). The use of force is not justified, however, if the actor, while unlawfully carrying a handgun, "sought an explanation from or discussion with the other person concerning the actor's differences with the other person." *Id.* One of the exemptions to the handgun rule, however, is that the law is not violated if the person is on her own premises or premises under her control. TEX. PEN. CODE ANN. § 46.15(b)(2) (Vernon 2003). The State based its case largely on the fact that, since appellant had not lived in her house for a month and had not paid that month's mortgage payment, the premises were not "under her control." The State argued that because the premises were not under appellant's control, she was not eligible for the handgun exemption or, by extension, the self-defense affirmative defense.

The problem arises with the omission of the two words 'or premises.' By omitting the two words and thus giving the jury an incorrect statement of the law, the charge as issued required that appellant both own the premises *and* have them under her control. Whether the premises were under her control is arguable; whether she owned them is not. She bought the house in 1999, making the down payment and all but one of the mortgage payments.[2] Had a proper charge been given, a jury could have determined that appellant qualified for the third exemption to the law against unlawfully carrying a handgun.

We believe that the omission of these words constituted egregious error by both going to the basis of the case and vitally affecting appellant's defensive theory. *Almanza*, 686 S.W.2d at 172. During deliberations, the jury asked several questions, including one which requested the definition of " 'control of residence' as it applies." The court responded that "control" was an issue for the jury to decide. Another question requested the Texas statute on carrying a handgun, in response to which the judge referred the jury to the charge. It is evident from these requests that the jury was struggling over the issue of whether the premises were under appellant's control and whether she would therefore be eligible to claim self-defense.[3] Thus, both the basis of the case and the main defensive theory, that is, whether appellant murdered her husband or shot him in self-defense, were affected by this error. Her first point of error is therefore sustained.

In light of our disposition of appellant's first point of error, it is unnecessary for us to examine the remaining points of error. We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

---

**2.** The deed to the house was not entered into evidence.

**3.** Appellant's first trial ended in a mistrial as a result of a hung jury. Aside from several typographical vagaries, the charges were identical.