

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-12-00447-CR

FRANCISCO GONZALEZ-MARTINEZ, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 181st District Court
Potter County, Texas
Trial Court No. 62,782-B, Honorable Richard Dambold, Presiding

October 18, 2013

OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Francisco Gonzalez-Martinez (appellant) appeals his conviction for possessing a controlled substance, namely cocaine.  Through a single issue, he contends the trial court erred by failing to submit to the jury an instruction pursuant to article 38.23(a) of the Texas Code of Criminal Procedure.  We agree.

***Authority***

Appellate review of error in a jury charge involves a two-step process.  *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App.1994); *see also Sakil v. State*, 287 S.W.3d

23, 25-26 (Tex. Crim. App. 2009). Initially, we determine whether error occurred, and if it did, we then evaluate whether it was harmful. *Abdno*r, 871 S.W.2d at 732.

In determining whether error occurred at bar, we first consider article 38.23(a) of the Texas Code of Criminal Procedure. It provides that "[n]o evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005). The statute also provides that when the testimony presented at trial raises an issue regarding whether evidence was so obtained, then " … the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained." *Id*.

Next, the requirements of art. 38.23 are triggered when (1) the evidence heard by the jury raises an issue of fact; (2) the evidence on that fact is affirmatively contested; and (3) the contested factual issue is material to the lawfulness of the conduct utilized to obtain the evidence being challenged. *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012). Finally, a fact issue may be raised from any source, and the evidence raising it may be strong, weak, contradicted, unimpeached, or unbelievable. *Garza v. State*, 126 S.W.3d 79, 85 (Tex. Crim. App. 2004).

### *Application of Authority*

Here, the police discovered the cocaine for which appellant was convicted on the floor of a local tavern. He was present in the establishment when three officers entered it to investigate potential drug trafficking. According to two officers who testified at trial (Bullard and Vigil), such activity frequently occurred at the bar. They further opined that

2

it usually transpired in or near the men's bathroom.  So too did the officers talk about entering the bar around 1:30 a.m., seeing a group of men gathered near the men's room, and witnessing several members of the group gesturing as if they were exchanging items with their hands.  In particular, Vigil described how he saw money changing hands.

Knowing the reputation of the tavern, seeing the group of individuals by the men's room, and watching money being exchanged led Vigil to suspect that drug activity was occurring, or so he testified.  Consequently, he approached the two individuals purportedly making the exchange.  Appellant happened to be one of them, while the other was someone described as a "white" man.

As the officer approached, the "white" man moved away into the crowd, according to Vigil.  Appellant remained put.  And, upon arriving in the presence of appellant, Vigil physically escorted him to where Bullard stood.  The search for the "white" man then began.  It involved Vigil leaving appellant with Bullard and walking around the bar.  Vigil expressed his belief that appellant was detained at that point.

Unable to find appellant's alleged cohort, Vigil said that he returned to Bullard.  As he did, he saw appellant throw something on the ground.  At that point, Vigil forcefully subdued and arrested appellant.  He also recovered the allegedly discarded item which consisted of cocaine.

As previously mentioned, Officer Bullard also testified at trial.  He described 1) entering the bar, 2) noticing the group of men by the bathroom, 3) seeing one person in the group holding out his hand in a "cupped" manner while another extended his hand in a grasping manner, 4) approaching one of the men who had his hand extended, 5) either asking the person to disclose what was contained therein or grasping the

3

person's arm or hand, 6) seeing the person drop his hand to his side, and 7) ultimately noticing a packet or the like on the floor next to the person. The latter happened to be appellant. Also of import is a particular exchange between the prosecuting attorney and this witness. The former asked Bullard: "[a]nd what was it about these individuals that caught your attention or made you pay attention to them in the first place?" The officer responded with:

> Like I said before, they're just gathered up and just drew our attention because that's just one of the clues that we focus on whenever we see something like that. If -- if they were just standing there, say for instance, just laughing and drinking, it would have been -- it wouldn't have drawn our attention. We would have moved on to the next group or something.

A third witness also testified at trial. She worked at the tavern as a waitress and bartender. Present when the officers entered that night, she described the incident as follows:

> They [the police] walked into the back door, they went into the men's rest room, and they came out and straight to [appellant]. They attacked him, threw him on the floor, and it was about three or four cops. One of them had his foot on his face and they just started -- they just attacked him. They just started man handling him.

When asked if she was "watching the event the whole time," she said: "Yeah. Well, while I was walking around I was glancing over. I mean, it was something everybody was paying attention to." When asked if she "could see clearly what was going on," she said: "Yes." When asked if appellant, a person whom she knew, "[w]as just standing there talking to this person," she replied: "Yes." And when queried about whether she saw appellant "exchange anything with anybody," she answered: "No, sir."

The testimony of these three witnesses does not paint a clear picture of the actual events. For instance, one officer stated that he first made contact with appellant,

4

while the other indicated that he did. One officer said he saw people exchanging money, while another did not. One says he grabbed appellant's arm while it was outstretched in the direction of other bar patrons, while the other said he detained appellant, walked him to where his fellow officer stood (which effectively terminated any contact appellant had with the group with whom he was initially seen) and left him there.[1] Admittedly, both officers alleged that appellant was interacting with a group of people with arms outstretched and that such conduct was indicia suggesting their engagement in drug activity. Yet, the bartender/waitress testified that she had a clear view, watched the entirety of the event, saw no exchanges from appellant to others, and recalled appellant simply talking to another patron before being "attacked" by the police. Finally, her testimony about appellant merely standing around and conversing with another was the type of conduct that one officer implicitly deemed insufficient to suggest criminal activity and, thus, draw his attention. Again, he testified that if they just saw a group standing around, talking and drinking, they "would have moved on to the next group or something."

So, we cannot but conclude that the evidentiary record raised issues of fact regarding what transpired and whether appellant actually engaged in the activity the officers thought sufficient to create reasonable suspicion to believe crime was afoot. Additionally, if the bartender's version of events was accepted by a fact-finder, then Bullard's own analysis of what the circumstances meant would be quite correct. Recalling his comment about just seeing patrons engaged in conversation and drinking, we would agree that individuals conversing near a men's room in a bar where drug

---

[1] Why or how appellant would be trying to exchange something when removed from the presence of his compatriots and placed under the control of law enforcement personnel went unexplained.

transactions have occurred are alone insufficient articulable facts from which to form a reasonable suspicion that crime is afoot. That leads us to also view the issue of the fact in question as quite material. Simply put, if appellant was not performing the furtive arm gestures attributed to him by the officers, then they would have lacked either probable cause or reasonable suspicion to detain him. Thus, the prerequisites of *Hamal* were met here and the trial court was obligated to provide the art. 38.23(a) instruction.

Of note is the absence of any finding by the trial court that a material issue of fact existed. Instead, it denied the requested instruction because appellant allegedly abandoned the drugs. Authority does hold that abandoned items subsequently collected by law enforcement personnel are not considered seized for purposes of a Fourth Amendment search and seizure analysis. *See e.g. Gomez v. State*, 486 S.W.2d 338 (Tex. Crim. App. 1972); *Miller v. State*, 458 S.W.2d 680 (Tex. Crim. App. 1970); *King v. State*, 416 S.W.2d 823 (Tex. Crim. App. 1967). It is also true that art. 38.23(a) pertains to evidence obtained unlawfully or in violation of one's right to be free of unreasonable searches and seizures. So, logic suggests that a defendant may not be entitled to an art. 38.23(a) instruction if the evidence in dispute was abandoned by him.

Yet, for there to be an abandonment of property, the decision to discard it must not be due to police misconduct. *McDuff v. State,* 939 S.W.2d 607, 616 (Tex. Crim. App. 1997) *accord*, *State v. Dixon*, No. 13-09-00445-CR, 2010 WL 3419231, 2010 Tex. App. Lexis 7156, at *18 (Tex. App.—Corpus Christi August 27, 2010, pet. ref'd) (mem. op.) (not designated for publication); *see Pickens v. State*, 712 S.W.2d 560, 562 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (wherein the court distinguished *Gomez, Miller* and *King* by noting that they do not involve the abandonment of property following an illegal detention). With this in mind we again refer to the testimony of Officer Vigil.

6

He described how appellant dropped the packet after being detained. To it we have the bartender's testimony about the absence of appellant's engagement in the furtive gestures purportedly relied upon by the officers to justify their detention of him. And, if she is to be believed, the same fact-finder had basis upon which to reasonably deduce that appellant's decision to discard the drugs (assuming he did discard them) was due to the police detaining him without lawful cause. This, then, leads us to conclude that the concept of abandonment did not justify the trial court's decision to withhold the instruction.

Next, had the instruction been given, the jury would have been free to accept the bartender's version of events and "disregard any . . . evidence . . . obtained" in violation of the law. TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005). Given that the evidence purportedly obtained in violation of the law was the very contraband appellant was convicted of possessing, we must conclude that the trial court's omission was not harmless under *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). So, the prerequisites of *Abdnor* exist here, that is, error and harm.

Accordingly, we sustain appellant's issue, reverse the judgment of the trial court and remand the cause for further proceedings.

Brian Quinn
Chief Justice

Publish.