

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-18-00035-CR

---

JIMMY EDWARD HARRIS, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 46638-B

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

A Gregg County jury convicted Jimmy Edward Harris of aggravated robbery with a deadly weapon and evading arrest or detention with a motor vehicle. After Harris pled true to the State's habitual-offender allegations, he was sentenced to life imprisonment on both counts. On appeal, Harris argues that his counsel rendered ineffective assistance by failing to object to evidence of statements made by Harris while he was in a substance abuse treatment facility. Harris also argues that the trial court erred in failing to instruct the jury that corroboration was required for his cellmate's testimony of his jailhouse confession.

We find that Harris has failed to demonstrate that counsel rendered ineffective assistance. We further conclude that Harris was not harmed by the lack of a corroboration instruction because his cellmate's testimony was sufficiently corroborated by other evidence tending to connect Harris to the crime. Accordingly, we affirm the trial court's judgment.

## I.     Factual Background

Ronald Walker, a retired police officer, testified that he saw an unknown man "standing back in the shadows" of his utility room on October 29, 2016, around 1:00 p.m. According to Walker, the man threatened to kill him before pummeling him with a metal object. Walker could not positively identify the assailant or remember anything after the beating, which resulted in multiple facial fractures and a skull fracture. Walker testified that the man took his car, billfold, safety deposit box, and jewelry boxes. He described the man, who was wearing a blue bandana, as a six-foot-tall Caucasian male weighing 180 pounds with short, light-colored hair. Walker was eventually able to right himself and call the police.

2

Officers with the Longview Police Department (LPD) were dispatched to Walker's home at 1:17 p.m. Walker provided officers with a description of his 2009 white Honda sedan. Andrew Allison, an LPD patrol officer, testified that he saw a Caucasian male with short, light-colored hair driving Walker's vehicle shortly after he was dispatched. Allison also saw that the lone driver was wearing a green shirt and had "almost like a strap of small facial hair." By 1:25 p.m., LPD officers were in hot pursuit of the vehicle. The high-speed chase ended after the driver crashed Walker's vehicle.

Trey Stephens, a former jailer, witnessed the crash and saw the perpetrator exit the vehicle. After hearing the sirens of patrol cars chasing behind, Stephens gave chase as the man ran for the woods. Stevens said the suspect was a 200-pound Caucasian male in his mid-thirties.[1] Neither Stephens nor the LPD were able to catch the man, and Allison could not positively identify Harris as the perpetrator. LPD began an investigation to identify him.

The first tip came from Walker's neighbor, Candice Hux, who heard that there was another unrelated burglary in the neighborhood on the morning of Walker's beating. Amy Works, another LPD officer, confirmed that the burglary had occurred at 9:35 a.m. Kelly Humphrey, a sergeant with the LPD, testified that Hux reported a suspicious person lurking in the neighborhood as if he were "possibly casing houses." Humphrey said that Hux described the man as a 6' Caucasian male weighing 220 pounds in a green shirt and black shorts. Humphrey was dispatched at 11:45 a.m. and began to surveil the area. He stopped a passerby who said that she had seen the person

---

[1]Kevin Nichols, an LPD officer, stated that the man was between 5'10" and 6'2" and weighed 160 to 190 pounds.

described by Hux on the same street where Walker lived. Humphrey testified that he patrolled the area for twenty minutes, but could not find the man. He spoke with Hux, who provided him with photographs of the suspicious man.[2]

Although not depicted by the photographs, Hux testified that she had seen the man's face and positively identified Harris as the person that was roaming the neighborhood on the day of Walker's beating. Stephens reviewed Hux's photographs and testified that the man he chased through the woods was wearing the same clothing and had the same hairstyle as the man in the photographs.

Lonnie Denison testified that he was admitted to the Homeward Bound drug rehabilitation facility in Dallas, Texas, in November 2016, where he met Harris on arrival. According to Denison, Harris "started bragging about what brought him there and how he hurt his hand." Because he was concerned about its violent nature, Denison recorded the story that Harris told on November 17 in his notebook. Denison testified:

> [Harris] said that immediately prior to him coming to Homeward Bound, he was high on methamphetamine; the police were looking for him; he ducked into someone's garage; and while he was hiding in the person's garage, the person—the owner of the home came into the garage; that they had an altercation; and that Mr. Harris beat the gentleman unconscious and thought that he left him for dead . . . He specified that after he thought the gentleman was dead, he took the gentleman's car and got away.

---

[2]Humphrey also joined the high-speed chase of the perpetrator later in the day and testified that the man was a twenty-five to thirty-five-year-old Caucasian male with blond hair.

Denison added that Harris claimed he was wearing something on the lower half of his face during the beating so he could not be identified. Denison, who estimated that Harris weighed 210 to 220 pounds at the time, reported the incident to local police.

Terry Davis, a detective with the LPD, testified that Harris listed his aunt's home, which was on a different street in Walker's neighborhood, only a nine-minute walk away, as his address. Davis went to Harris' aunt's home in the hopes of questioning him, but Harris was not present. After speaking with the aunt, Davis left his card with her and requested that she call him when she became aware of Harris' whereabouts. Davis testified that he was never called.

After Davis learned that Harris was arrested on an unrelated offense, he visited him in jail and asked for a specimen of his DNA. Davis obtained a warrant for the specimen after Harris refused consent. According to Davis, Harris' book-in sheet showed him to be 5'11" and 230 pounds. Davis spoke to Harris' cellmate and, after the conversation, believed that Harris had beaten Walker and evaded arrest in his car.

Harris' cellmate, Thomas Perry, had a list of criminal convictions and was a reluctant witness. Although he initially waivered, Perry said that Harris became worried after detectives asked for a DNA swab because he believed there might be "evidence in the car that got wrecked or something." According to Perry, Harris wanted to steal and had targeted Walker because he lived alone. Harris admitted to Perry that he beat Walker "pretty bad" and wrecked the car. According to Perry, Harris told him "the car was a spur-of-the-moment kind of thing" and that he did not mean to steal it.

5

Harris testified in his own defense and claimed that he did not leave his house until 10:30 a.m. and was with his family after Walker was beaten. In explaining his whereabouts after he left his home, Harris testified that he went to the American Dream Hotel to get high on drugs with a woman he called "Mom." Harris testified that a man named Wes was present, then left the hotel for approximately one hour, and returned with a four-door white car. Harris decided to drive Wes' car to purchase more drugs. According to Harris, Wes, who was wearing a green shirt and shorts, admitted that he had committed the burglary and that the car was stolen. Harris testified that he began arguing with Wes as a result of the revelation that he was driving a stolen car. Harris said that he got out of the car, that Wes drove it away, and that Harris called his father to pick him up. Harris' family insisted that he seek treatment for his drug abuse. Harris told the jury that he was not friends with Denison and that he told Perry about the incident, but never said that he was the perpetrator of the crimes.

The jury did not believe Harris. After rejecting his testimony, they convicted him of both offenses.

## II.     Harris Cannot Demonstrate that his Counsel Rendered Ineffective Assistance

In his first point of error, Harris argues that his counsel rendered ineffective assistance by failing to object to Denison's testimony. Harris' sole argument on this point is based on Article 38.101 of the Texas Code of Criminal Procedure, which states, "[A] communication to any person involved in the treatment or examination of drug abusers by a person being treated voluntarily or being examined for admission to voluntary treatment for drug abuse is not admissible." TEX. CODE CRIM. PROC. ANN. art. 38.101 (West 2005).

6

## A. Standard of Review

"The applicant has the burden to prove ineffective assistance of counsel by a preponderance of the evidence." *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011) (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). The right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). Thus, to prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). *See Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009). The first prong requires a showing that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. This requirement can be difficult to meet since there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second *Strickland* prong, sometimes referred to as "the prejudice prong," requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* Thus, in order to establish prejudice,

> an applicant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." [*Strickland*, 466 U.S.] at 687 . . . . It is not sufficient for Applicant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693 . . . . Rather, [he] must show that "there is a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt." *Id.* at 695.

*Martinez*, 330 S.W.3d at 901.

7

A failure to make a showing under either prong defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003). Additionally, the Texas Court of Criminal Appeals has said, "Trial counsel 'should ordinarily be afforded an opportunity to explain his actions' before being denounced as ineffective." *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). Therefore, allegations of ineffectiveness "must 'be firmly founded in the record.'" *Bone v. State*, 77 S.W.3d 828, 834 (Tex. Crim. App. 2002) (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). "[T]he presumption of a sound trial strategy cannot be overcome absent evidence in the record of the attorney's reasons for his conduct." *Martinez*, 330 S.W.3d at 901 (quoting *Busby v. State*, 990 S.W.2d 263, 269 (Tex. Crim. App. 1999)). Thus, where an appellate record is silent as to why trial counsel failed to take certain actions, the appellant has "failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable." *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007); *see Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

The *Strickland* test "of necessity requires a case-by-case examination of the evidence." *Williams v. Taylor*, 529 U.S. 362, 382 (2000) (quoting *Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring in judgment)). We "must look to the totality of the representation, and its decision must be based on the facts of the particular case, viewed at the time of counsel's conduct so as to eliminate hindsight bias." *Martinez*, 330 S.W.3d at 901 (citing *Strickland*, 466 U.S. at 690). In all cases, the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding." *Id.* (quoting *Strickland*, 466 U.S. at 696).

## B.    Analysis

Article 38.101 applies only to communications of drug abusers who are "being treated voluntarily or being examined for admission to voluntary treatment."  TEX. CODE CRIM. PROC. ANN. art. 38.101.  Because Harris was already admitted into the treatment program, we examine only whether he was being treated voluntarily.

Harris testified that he went to the East Texas Counsel on Alcoholism and Drug Abuse (ETCADA) at the insistence of his family and was told that he "need[ed] to get in rehab."  Harris added that he decided on the Homeward Bound program because there were no drug treatment programs in his area that were accepting new admissions.  Critically, Harris makes no argument that he voluntarily entered Homeward Bound.  In fact, Harris' brief states, "It is clear from the testimony of the Defendant and Denison that both were in involuntary treatment for drug abuse." We agree that the record supports Harris' assertion that his treatment was involuntary.

In 2014, Harris had been convicted of possession of a prohibited substance in a correctional facility and was sentenced to five years' imprisonment.  Because he was released prior to serving his full sentence, the record indicates that Harris was on parole.  "A parole panel may impose as a condition of parole or mandatory supervision any condition that a court may impose on a defendant placed on community supervision under Chapter 42A, Code of Criminal Procedure."  TEX. GOV'T CODE ANN. § 508.221 (West Supp. 2018).  "Conditions of community supervision may include conditions requiring the defendant to . . . participate in substance abuse treatment services in a program or facility approved or licensed by the Department of State Health Services."  TEX. CODE CRIM. PROC. ANN. art. 42A.301(b)(14) (West 2018).  A defendant who enters a drug treatment

9

program as a result of a condition of community supervision or parole does so involuntarily. *See Absalon v. State*, 460 S.W.3d 158, 163 (Tex. Crim. App. 2015).

Our appellate record fails to contain counsel's reasoning as to why he did not object to Denison's testimony. It is entirely plausible that counsel concluded that Article 38.101 did not apply because he believed that Harris' treatment was involuntary. Because we can fathom a reason why counsel could have chosen to forego an Article 38.101 objection, the presumption of a sound trial strategy leads us to conclude that Harris cannot meet the first *Strickland* prong.[3] Accordingly, we overrule Harris' first point of error.

## III. Harris Was Not Harmed by the Lack of a Corroboration Instruction

In his second point of error, Harris argues that the trial court erred in failing to instruct the jury, *sua sponte*, that Perry's testimony required corroboration. Harris' argument is based on Article 38.075 of the Texas Code of Criminal Procedure, commonly known as the jailhouse witness rule, which reads:

> A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

TEX. CODE CRIM. PROC. ANN. art. 38.075(a) (West Supp. 2018).

---

[3]We further find that Harris could not meet the second *Strickland* prong as a result of Hux's in-court identification of Harris as the suspicious man who was in Walker's neighborhood and Perry's testimony of Harris' jailhouse confession.

10

### A. Standard of Review

We employ a two-step process in our review of alleged jury charge error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007). "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007)). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury:  it is the function of the charge to lead and prevent confusion." *Id*. (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)). Error occurs where the jury is not charged with the law applicable to the case. *See Phillips v. State*, 463 S.W.3d 59, 64–65 (Tex. Crim. App. 2015).

The level of harm necessary to require reversal due to jury charge error is dependent on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. Here, because Harris did not object to the charge, we will not reverse unless the record shows the error resulted in egregious harm, *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)), such that he did not receive

11

a fair and impartial trial. *See Almanza*, 686 S.W.2d at 171; *Loun v. State*, 273 S.W.3d 406, 416 (Tex. App.—Texarkana 2008, no pet.). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007).

"Neither party bears the burden on appeal to show harm or lack thereof under this standard." *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). "Instead, courts are required to examine the relevant portions of the entire record to determine whether appellant suffered actual harm, as opposed to theoretical harm, as a result of the error." *Id.*

### A.     Analysis

"Article 38.075 was enacted in recognition that incarcerated individuals have an incentive to provide information against other incarcerated individuals and that this testimony should be corroborated" because its veracity can be highly suspect. *Phillips v. State*, 463 S.W.3d 59, 66 (Tex. Crim. App. 2015) (citing Senate Comm. On Criminal Justice, Bill Analysis, Tex. S.B. 1681, 81st Leg., R.S. (2009)). "In enacting the jailhouse-witness statute, it appears that the legislature was concerned not only with whether the content of the statement made to that witness was trustworthy, but also with whether the jailhouse witness himself was trustworthy." *Id.* at 68.

Here, it was clear that Perry was testifying about statements against interest made by Harris while he was confined on another offense committed after he left Homeward Bound. Accordingly, "the trial court erroneously omitted a jailhouse-witness instruction that should have been given pursuant to Article 38.075(a)." *Id.* at 64–65. We next evaluate whether Harris was harmed by the jury charge omission.

12

"An instruction under article 38.075 'merely informs the jury that it cannot use the . . . testimony unless there is also some [independent] evidence connecting the defendant to the offense.'" *Brooks v. State*, 357 S.W.3d 777, 781 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (quoting *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002)); *see* TEX. CODE CRIM. PROC. ANN. art. 38.075(a). "Once it is determined that such . . . evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the fact-finder's decision-making." *Brooks*, 357 S.W.3d at 781 (quoting *Herron*, 86 S.W.3d at 632). "Therefore, the existence of corroborating evidence 'tending to connect' appellant to the offense can 'render harmless' the trial court's failure to submit an article 38.075 instruction by fulfilling the purpose that such an instruction is designed to serve." *Id.* at 781–82. Under the egregious harm standard, the omission of the instruction is generally harmless unless the corroborating evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *See id*. at 782 (quoting *Herron*, 86 S.W.3d at 632).

Here, we find that there was ample testimony tending to connect Harris to the offense. Harris lived nine minutes away from Walker and placed himself in the neighborhood on the day of the incident. Hux positively identified Harris as the man she had seen in Walker's neighborhood on the morning of the offense. According to Humphrey, Hux reported that Harris' suspicious demeanor caused her to believe that he was "possibly casing houses." Stephens testified that the man in Hux's photograph was wearing the same clothes and had the same hairstyle as the man he chased through the woods after Walker's car was wrecked. Descriptions from Walker, Stephens, and LPD officers about the perpetrator's height, weight, race, hairstyle, and hair color generally

13

fit Harris' physical attributes, and the jury was able to compare Harris' appearance to Hux's photo of the suspicious man. Further, Denison testified about Harris' incriminating statements made during drug treatment.

We do not find that the corroborating evidence was "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Brooks*, 357 S.W.3d at 782 (quoting *Herron*, 86 S.W.3d at 632). Rather, we conclude there was strong evidence tending to connect Harris to the offense. Accordingly, we overrule Harris' last point of error.[4]

## IV. Conclusion

We affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:      October 19, 2018
Date Decided:       November 8, 2018

Do Not Publish

---

[4]Harris also argued that his counsel rendered ineffective assistance by failing to request a jailhouse corroboration instruction. Because we conclude that sufficient evidence from Hux and Denison corroborated Perry's testimony, we likewise find that Harris cannot establish prejudice under the second *Strickland* prong.