

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00231-CR

CARLTON LAMAR GRANT, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 18094

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

An Upshur County jury convicted Carlton Lamar Grant of the capital murder of Rachel Ann Rhoads, and the trial court sentenced him to imprisonment for life, without parole. On appeal, Grant argues (1) that the evidence is legally insufficient to support the jury's verdict of guilt and (2) that the trial court erred by failing to submit an accomplice-witness instruction in the jury charge.

Grant admits that he murdered Rhoads. But he contends that it was not a kidnapping-based capital murder. Grant claims he killed Rhoads so quickly that she was dead before he did anything that could be considered kidnapping. We reject that argument. We find that legally sufficient evidence supports Grant's conviction of capital murder.

Much of the testimony against Grant came from a participant in the events. On appeal, Grant contends that the jury should have been given an accomplice-witness instruction about that testimony, i.e., an instruction to the effect a defendant cannot be convicted solely on the testimony of an accomplice. The trial court gave an instruction to that effect. Grant contends that the jury also should have been given a definition of "accomplice." Grant, though, did not object to the jury charge at trial. So, he must show that the charge as given caused him egregious harm. Assuming, but not deciding, that a proper jury charge would have had everything Grant now asks for, we find that Grant was not egregiously harmed by the jury charge actually given. Much of the testimony against Grant came from the accomplice. But not all. The accomplice testimony was amply corroborated by other witnesses and by forensic evidence.

Accordingly, we affirm the trial court's judgment.

## I.    Factual Background

At trial, Grant's then-girlfriend, Lindsey McFadden, was the State's key witness. McFadden testified that she was dating Grant, who did not have a job and had moved into her apartment. She described her relationship with Grant as "[v]ery abusive" and admitted that both she and Grant used methamphetamine. The evidence showed that neither McFadden nor Grant had any means of transportation and that McFadden was being evicted at the time of the offense.

McFadden, who was also under indictment for murder as Grant's accomplice, testified in detail about Rhoads's murder. McFadden said she met Amber Mullins at a parenting class and learned that she lived within walking distance of her apartment. Rhoads was Mullins's roommate. McFadden testified that, on March 29, 2018, she and Grant walked almost a mile to Mullins's and Rhoads's home for a visit. According to McFadden, Rhoads owned a silver Suzuki and Grant arranged for Rhoads to give them a ride back to McFadden's apartment. McFadden sat in the front passenger seat as Rhoads drove, with Grant sitting in the backseat behind Rhoads. McFadden thought that she and Grant would be dropped off at her apartment, but Grant had other plans.

McFadden testified that, as they "went to turn into [her] apartment," Grant asked to be taken to an unnamed friend's house instead. According to McFadden, Rhoads "said no at first, but then she gave in and said okay." McFadden testified that, during the drive, Grant swung a homemade garotte consisting of a ligature and hooks around Rhoads's neck and began choking her, causing her to fight and struggle. McFadden said the car swerved uncontrollably while Grant used the garotte to pull Rhoads into the backseat. Mc Fadden testified that, as this was

3

going on, she reached for the steering wheel to steady the vehicle. McFadden testified that Grant then tied a black zip tie around Rhoads's neck. McFadden testified that Rhoads fought against Grant, but soon Rhoads was not "able to move around with the same amount of force." McFadden said that she was able to put the car in park and get into the driver's seat. She said that she continued to hear Rhoads struggle with Grant, who "hit her a couple of times and put her into the [back] floorboard of the car."

McFadden testified that she was distressed and could barely drive and that Grant took over the task while McFadden got in the backseat with Rhoads. According to McFadden, Grant stopped at "a row of trailers" and "spoke to some people" that Grant knew before he went to the Big Oak Trailer Park to purchase marihuana. McFadden said that, during the drive, Rhoads remained in the backseat floorboard, was unable to move, and was covered with a zebra-print blanket.

Joannie Saldana, who had met Grant at a game room in Longview, corroborated McFadden's account by saying that Grant came to her house on March 29 in a "silver, gray car" she had not seen before. Saldana described Grant as "happy, in a good mood, [and] boisterous." She testified that Grant was fiddling with "like a bungee cord, like a broken bungee cord with hooks on it," and identified the makeshift garrote as the object he was holding. According to Saldana, Grant said he needed it for his luggage because he and McFadden were going out of town. Saldana's girlfriend, Jennifer Arnold, saw McFadden in the silver vehicle and started walking toward it, but according to Saldana, McFadden jumped out of the car and said they were

4

looking for something they had dropped. Saldana testified that Grant took a black zip tie from her toolbox, said he was leaving town, and drove away.

McFadden said that, after obtaining marihuana from a man named Joe at the Big Oak Trailer Park, she abided by Grant's instructions to clean out Rhoads's car. They then parked it close to McFadden's apartment, moved Rhoads from the backseat floorboard into the trunk, walked to the apartment to destroy the clothes they were wearing, packed their bags, and went to sleep.

The next morning, McFadden said that she and Grant "drove around for a long time" to find a place to dispose of Rhoads's body. McFadden testified that they stopped at a gas station in Diana, Texas, to borrow a lighter. Nancy Wilson, who worked at Stop-A-Minit convenience store in the Diana gas station said that a "[s]cared, nervous, skitsy" woman came in and borrowed her white lighter but never came back to return it. After obtaining the lighter, McFadden wiped Rhoads's body with vinegar and Windex before Grant dumped Rhoads's body in a utility right-of-way near a farm-to-market road, poured gasoline on her, and lit her on fire.

According to McFadden, she and Grant ran back to Rhoads's car and left for Fort Worth, where Grant had family and friends. During the drive, McFadden suddenly remembered that she forgot to take the black zip tie from Rhoads's neck and confessed the error to Grant, who beat her for it. McFadden said there were several arguments between her and Grant after the murder.

Tommie Chaffin, McFadden's mother, testified that McFadden called her to say that she was headed to the metroplex. Chaffin said that came as a surprise to her because McFadden had prepared Easter baskets for her children and had picked out her own outfit for Easter. Chaffin,

5

who could hear Grant in the background, testified that the conversation made her believe McFadden was unsafe.

By that time, Rhoads's mother, Andrea Rhoads, reported her daughter missing after her workplace informed her that Rhoads had not shown up for work. Andrea was worried because she knew Rhoads used drugs and lived with Mullins, who had also not seen Rhoads. Police were provided with a description of Rhoads's vehicle and began searching for her.

Todd Davis, a police officer for the City of Bedford, stopped a vehicle matching that description for lack of any license plate. Davis said the stop occurred at 2:00 a.m. at a gas station in an area known for narcotics activity. A dash-camera recording of Davis's traffic stop showed that Rhoads's vehicle was driven by Grant and occupied by McFadden. According to Davis, Grant and McFadden said they did not have license plates on the car because they had just acquired it from Rhoads. Although Davis did not believe their stories about how they got the car, he did not arrest them. According to McFadden, after the traffic stop, Grant removed all the carpeting from Rhoads's car.

Roxanne Warren, an investigator with the Upshur County Sheriff's Office (USCO), testified that a private citizen found Rhoads's body on Easter Sunday, April 1, 2018. Warren said that Rhoads's body was dumped on a gas pipeline "right-of-way located off of FM 726 coming off of State Highway 154." Warren surveyed the crime scene and said there was a sock near Rhoads's body and a black plastic zip tie around Rhoads's neck, which she sent to the Texas Department of Public Safety Crime Laboratory (DPS Crime Lab), along with a partially burned zebra-print blanket. Warren also testified that she smelled cleaning agents at the scene and found

6

a part of a vinegar bottle she collected as evidence. Warren also noticed a ligature and hook contraption wound into Rhoads's hair. Photos of Rhoads's charred remains were shown to the jury.

Stacey Murthy, the medical examiner who performed Rhoads's autopsy, testified that Rhoads's body was decomposing, infested with maggots, and had been burned but was identifiable due to unique tattoos. Due to the body's positioning, Murthy opined that Rhoads had died before she was lit on fire. Considering the zip tie, which was secured tightly around her neck, and lack of skull fractures, Murthy concluded that the cause of Rhoads's death was strangulation. Murthy also found the ligature and one hook wound in Rhoads's hair. When asked to opine how long it took Rhoads to choke to death, Murthy testified that "[g]enerally speaking it would take about 4 to 5 minutes before someone would be completely dead" from strangulation from the zip tie.

Timothy Don Hall, a homicide investigator for the UCSO, contacted Davis after learning that Grant and McFadden were stopped in Rhoads's car. Hall went to McFadden's apartment and learned from a neighbor, Vicki West, that McFadden and Grant had left town on March 30. Saldana and Arnold contacted the USCO, after hearing media coverage of Rhoads's death, to report that Grant had driven Rhoads's vehicle. Hall began the hunt for Grant and McFadden, who were arrested on April 5 while walking up to Rhoads's car, which by then had a stolen license plate.

Stephen Christopher Baggett, a Texas Ranger, testified that McFadden had a black eye, "several bruises up and down her arms, [he thought] on her shoulder, legs . . . [and] one on her

7

hip or buttocks area." According to Baggett, McFadden said Grant gave her those injuries after she confessed her failure to dispose of the zip tie around Rhoads's neck. The jury saw photos of McFadden's injuries on the day of her arrest.

According to Hall, McFadden was cooperative. Hall said that McFadden told the UCSO what happened on the day Rhoads died, including that Grant had asked Rhoads for a ride, met with a man named Joe at the Big Oak Trailer Park after Rhoads's death, and dumped Rhoads's body in Diana. McFadden had also described to the USCO how Rhoads's body was lit on fire. Hall also said McFadden revealed that she had hidden a duffle bag belonging to Rhoads in an intake vent in a wall of her apartment. Hall said the UCSO recovered Rhoads's bag, which would not have occurred without McFadden's truthful statements.

Hall testified that, unlike McFadden, Grant lied throughout his interview. Grant, who admitted to being in the car with Rhoads and McFadden after leaving Mullins's home, told Hall that he was dropped off alone. Grant said he had a friend named Joe at the Big Oak Trailer Park but denied having been there recently. Grant denied that he was ever in Diana, but then slipped up and said "he didn't know anything about a white lighter" bought there. According to Hall, the color of the lighter had not yet been revealed.[1]

Baggett collected DNA samples from McFadden and Grant. Warren collected evidence from Rhoads's vehicle, which had been turned over to the UCSO for processing. According to Warren, the car was "stripped away" on the inside. Warren collected swabs of blood stains she

---

[1] Hall testified that the UCSO officers later went to the gas station in Diana and learned that the color of the lighter was white.

8

found in the car and sent the swabs to the DPS Crime Lab for testing. Warren found Rhoads's car key in Grant's property box after his arrest.

Amber Moss, a forensic scientist and DNA supervisor for the DPS Crime Lab, testified that Grant's DNA profile was included in "two of the DNA profiles that [she] obtained from the sock" found next to Rhoads's body in Diana. According to Moss, a swab of the blanket that was melted to a vinegar bottle revealed a mixed DNA profile that included Grant and Rhoads as contributors and excluded McFadden as a contributor. Moss testified that McFadden's blood was found in the front passenger seat, which was consistent with her testimony that Grant struck her during an argument in the car. As for a blood sample found in the backseat, Moss testified that Rhoads could not be excluded as a contributor.

After hearing this evidence, the jury convicted Grant of capital murder.

## II. Legally Sufficient Evidence Supports Grant's Conviction

The offense of murder occurs when a person "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1) (Supp.). Grant admits that the evidence supported a conviction for murder. Yet, he argues that the evidence was insufficient to prove the offense of capital murder, which is the intentional killing of a victim while "in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat." TEX. PENAL CODE ANN. § 19.03(a)(2) (Supp.).

9

## A.      Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Here, the State alleged in the indictment that Grant intentionally caused Rhoads's death by strangulation while he was in the course of committing or attempting to commit the offense of kidnapping.

## B.    Sufficient Evidence Supports the Challenged Kidnapping Element

Grant's brief admits, "Here we have a murder, but we have no kidnapping." As a result, Grant argues only that the State did not establish the "kidnapping" element of the capital murder, as alleged.

A person commits the offense of capital murder if he intentionally causes another's death "in the course of committing or attempting to commit kidnapping." TEX. PENAL CODE ANN. § 19.03(a)(2). A person commits the offense of kidnapping "if he intentionally or knowingly abducts another person." TEX. PENAL CODE ANN. § 20.03(a). "'Abduct' means to restrain a person with intent to prevent [her] liberation by: (A) secreting or holding [her] in a place where [s]he is not likely to be found; or (B) using or threatening to use deadly force." TEX. PENAL CODE ANN. § 20.01(2) (Supp.). "'Restrain' means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." TEX. PENAL CODE ANN. § 20.01(1) (Supp.). Restraint is without consent if accomplished by "force, intimidation, or deception." TEX. PENAL CODE ANN. § 20.01(1)(A).

The evidence showed that Grant and McFadden had no transportation. Grant asked Rhoads for a ride and, while Rhoads was driving, he forcefully removed her from the driver's seat of her car into the backseat using a make-shift garrote, which restricted her movement. He

11

then tied a zip tie around her neck, got into the driver's seat of the vehicle, and drove it to several places. McFadden testified that Rhoads did not consent to being tied up, could not move after the zip tie had been placed around her neck, and did not consent to being driven anywhere while on the back floorboard of her own vehicle. This showed that Grant intentionally abducted Rhoads by using deadly force.

Even so, we are left with the question of whether Grant interfered substantially with Rhoads's liberty. Grant's briefing suggests that Rhoads's restraint was too short to constitute any substantial interference. However, the Texas Court of Criminal Appeals has expressly overturned a sister court's analysis finding that substantial interference "requires more than temporary confinement or slight movement which is part and parcel of the commission or attempted commission of another substantive criminal offense." *Reyes v. State*, 84 S.W.3d 633, 636 (Tex. Crim. App. 2002) (quoting *Hines v. State*, 40 S.W.3d 705, 714 (Tex. App.—Houston [14th Dist.] 2001), *rev'd*, 75 S.W.3d 444, 447–48 (Tex. Crim. App. 2002)). In rejecting our sister court's analysis, the Court of Criminal Appeals wrote,

> [T]here is nothing in the Texas statute that even *suggests* that it is necessary for the State to prove that a defendant moved his victim a certain distance, or that he held [her] a specific length of time before he can be found guilty of kidnapping. In fact, we have consistently held that under the kidnapping statute, there is no specific time requirement for determining whether a restraint has taken place.

*Hines v. State*, 75 S.W.3d 444, 447–48 (Tex. Crim. App. 2002) (footnote omitted) (citation omitted); *see Reyes*, 84 S.W.3d at 636–37.

Here, viewing the evidence in the light most favorable to the fact-finder's decision, the evidence showed that Grant substantially interfered with Rhoads's liberty. After tying the zip tie

around Rhoads's neck, he began driving her vehicle. Murthy testified that, "[g]enerally speaking it would take about 4 to 5 minutes before someone would be completely dead" from strangulation from the zip tie. As a result, the jury was free to determine that Rhoads was still alive while Grant was driving her vehicle. Considering the evidence as a whole, we find it sufficient for the jury to have found that Grant interfered substantially with Rhoads's liberty and, by failing to release the zip tie and Rhoads, committed the offense of capital murder while in the course of committing the kidnapping.

"A kidnapping becomes a completed offense when (1) a restraint is accomplished, and (2) there is evidence that the actor had the specific intent to prevent liberation by secretion or the use or threatened use of deadly force." *Griffin v. State*, 491 S.W.3d 771, 775 (Tex. Crim. App. 2016). Because we find the evidence legally sufficient to support the jury's verdict of guilt, we overrule Grant's first point of error.[2]

### III.    Grant Was Not Egregiously Harmed by the Jury Charge

It is undisputed that McFadden, who was also charged with Rhoads's murder, was an accomplice as a matter of law. *See Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017); *Davison v. State*, 602 S.W.3d 625, 643 (Tex. App.—Texarkana 2020, pet. ref'd); *Phelps v. State*,

---

[2]Grant also argues that the evidence was insufficient to prove capital murder because the State failed to show that he committed the murder to facilitate the kidnapping. In support, he cites to *Ibanez v. State*, which said, "A killing and unrelated taking of property do not constitute capital murder under 19.03(a)(2): the State must prove a nexus between the murder and the theft, i.e. that the murder occurred in order to facilitate the taking of the property." *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex. Crim. App. 1986) (plurality op.). The underlying felony in *Ibanez* was robbery, and the robbery statute itself requires an intent to maintain control over property. *Id.* (citing TEX. PENAL CODE ANN. § 29.02). Because this is not the case with the kidnapping statute, *Ibanez* does not control our analysis. As the Texas Court of Criminal Appeals has explained, "[T]he plain language of Section 19.03(a)(2) contains no general requirement that in order to constitute capital murder, the murder must be committed to facilitate the underlying felony offense. We have previously rejected arguments that the evidence must show that the murder was committed in furtherance of the underlying felony." *Griffin*, 491 S.W.3d at 776.

532 S.W.3d 437, 442 (Tex. App.—Texarkana 2017, pet. ref'd). In his last point of error, Grant argues that the trial court erred by failing to submit an accomplice-witness instruction.

"We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.)).

Here, Grant's complaint of the lack of any accomplice-witness instruction is without merit. The trial court specifically instructed the jury, as follows:

> YOU ARE FURTHER INSTRUCTED THAT A CONVICTION CANNOT BE HAD UPON THE TESTIMONY OF AN ACCOMPLICE UNLESS CORROBORATED BY OTHER EVIDENCE TENDING TO CONNECT THE DEFENDANT WITH THE OFFENSE COMMITTED; THE CORROBORATION IS NOT SUFFICIENT IF IT MERELY SHOWS THE COMMISSION OF THE OFFENSE.

Moreover, to the extent Grant argues that the trial court should have included something else, such as the definition of the term "accomplice" pursuant to *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013), we find that he was unharmed.

"The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error." *Murrieta*, 578 S.W.3d at 555 (citing *Abdnor*, 871 S.W.2d at 732). When, as here, the defendant "did not object to the charge, we will not reverse [the judgment] unless the record shows the error resulted in egregious harm." *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005)). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable

right, or vitally affects a defensive theory." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)).

"[T]he record must show that a defendant has suffered actual, rather than merely theoretical, harm from jury instruction error." *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005) (citing *Dickey v. State*, 22 S.W.3d 490, 492 (Tex. Crim. App. 1999)). "Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Bulington v. State*, 179 S.W.3d 223, 231 (Tex. App.—Texarkana 2005, no pet.) (quoting *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002)).[3] "Once it is determined that such non-accomplice evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the fact[-]finder's decision-making." *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

Here, even though the term "accomplice" was not defined in the jury charge, it was clear that McFadden was the only accomplice to the capital murder, given that only she and Grant were present during the offense. Also, because there was ample corroboration of McFadden's statements by other witnesses, the non-accomplice evidence was convincing. McFadden testified that the offense occurred on March 29, which was corroborated by Hall, Chaffin, and

---

[3]In *Casanova v. State*, the court stated,

> [T]he reviewing court must take the entire record into account, as in any *Almanza* analysis, to assess whether the jury, had it been properly instructed on the law requiring corroboration of accomplice-witness testimony, "would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive."

*Casanova v. State*, 383 S.W.3d 530, 534 (Tex. Crim. App. 2012) (footnote omitted) (citation omitted) (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)) (citing *Herron*, 86 S.W.3d at 632).

Andrea. Hall testified that McFadden told the UCSO how the offense occurred, which was corroborated by Murthy's expert opinion about the cause of Rhoads's death and the DNA evidence found at the scene. McFadden testified about the make-shift garrote and black zip tie used to strangle Rhoads, and those items were seen by Saldana in Grant's hands and were found at the scene of the crime by Warren. McFadden said that Grant drove to several places before stopping at the Big Oak Tailer Park to visit a man named Joe. Saldana and Arnold came forward about the encounter with Grant at Saldana's house on the day of the crime, and Grant himself said he knew a man named Joe at the Big Oak Trailer Park. McFadden testified that she and Grant decided to leave town on the day after the murder with Rhoads still in the trunk of the car. Chaffin testified that McFadden said she was leaving town and, according to Hall, West said McFadden left on March 30. McFadden testified that she and Grant drove around looking for a place to dump Rhoads's body and, while in Diana, went into a gas station to borrow the lighter used to burn Rhoads's body. That evidence was corroborated by Williams, who testified that McFadden borrowed her lighter in Diana but never returned it. McFadden said that she used vinegar to clean Rhoads's body, which was covered by a zebra-print blanket, and Warren found both the blanket and vinegar bottle at the scene. Davis's dash-camera recording corroborated McFadden's testimony that Grant drove Rhoads's vehicle, and Warren's testimony fit with McFadden's statement that Grant removed the carpeting from the vehicle.

Due to the great extent of evidence corroborating McFadden's testimony, which also tended to connect Grant to the offense, we cannot say that Grant suffered egregious harm from

16

the lack of any omitted language relating to accomplice-witness testimony in the trial court's charge.  As a result, we overrule his last point of error.

## IV.     Disposition

We affirm the trial court's judgment.


                                        Jeff Rambin
                                        Justice


Date Submitted:        July 15, 2024
Date Decided:          August 30, 2024

Do Not Publish